

IN THE

# Court of Appeals of Indiana

Terry L. Hargis, Jr.,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*



FILED

Apr 22 2026, 8:43 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

April 22, 2026

Court of Appeals Case No.
25A-CR-1194

Appeal from the Allen Superior Court

The Honorable David M. Zent, Judge

Trial Court Cause No.
02D06-2205-F3-43

**Opinion by Judge Vaidik**
Judges Mathias and Pyle concur.

**Vaidik, Judge.**

## Case Summary

[1] Terry L. Hargis, Jr., was convicted of two counts of Level 3 felony neglect of a dependent resulting in serious bodily injury, found to be a habitual offender, and sentenced to 52 years in the Department of Correction. He now appeals, arguing: (1) the trial court erred by trying him in absentia; (2) his two neglect convictions constitute double jeopardy; and (3) his sentence is inappropriate. We hold that Hargis was properly tried in absentia and that he waived his inappropriate-sentence claim by failing to develop a cogent argument. However, we conclude that the two neglect convictions constitute double jeopardy, so we reverse the second conviction and sentence and remand to the trial court with instructions to amend the sentencing documents accordingly. We also direct the trial court to attach the habitual-offender enhancement to the sentence for the remaining neglect conviction.

## Facts and Procedural History

[2] In 2021, Hargis was in a relationship with Amy Savino. They lived together with their son, J.H., who was born in January 2021, and several children from prior relationships. Savino worked as a mail carrier for the post office while Hargis stayed home with the children.

[3] When Savino returned home from work on the evening of June 2, 2021, Hargis was not in a good mood, and they had an argument. Hargis said he was "having a really hard time with life in general at the moment and like handling

his anger." Tr. Vol. 2 p. 244. Later that night, Savino woke up and fed J.H., who was still less than five months old. Hargis then took J.H. so Savino could go back to sleep.

[4] In the morning—June 3—Hargis told Savino that "something happened" with J.H. overnight, but he was "very vague about it." *Id.* at 246. Savino had to go to work, so she told Hargis to keep an eye on J.H. When Savino returned that night, she held J.H. and felt a "click" in his leg. *Id.* She "didn't think anything of it at the time," but when she changed J.H.'s diaper later that night, his leg "sort of fell to the side." *Id.* at 246, 247. He cried and seemed to be in pain. Savino saw that J.H. had a bruise on one of his legs and "was starting to look a little swollen." *Id.* at 247.

[5] The next morning—June 4—Hargis and Savino discussed J.H.'s condition, and Hargis said he would take J.H. to a doctor that day. But Hargis didn't take J.H. to a doctor, so when Savino returned from work, she took J.H. to his pediatrician's office. Imaging revealed that J.H.'s right femur, tibia, and fibula were broken and that he had broken ribs. The leg fractures hadn't begun healing, meaning they were "less than five to seven days old." Tr. Vol. 3 pp. 168, 171. The rib fractures were healing and were likely several weeks old.

[6] Hargis provided several explanations for how J.H. was injured. He told Savino that he grabbed J.H. by the leg to prevent him from falling, that he may have sat on J.H. on a couch, and that he repeatedly fell onto a couch while holding J.H. to make J.H. laugh. Hargis told the Department of Child Services that J.H. had

fallen out of bed and also that the other children had thrown J.H. onto a couch. A month after J.H.'s injuries were discovered, Hargis sent Savino the following text message:

> You know what I remember everything when it happened and yeah I did get so mad at [J.H.] for crying and I hit him so hard in his leg that it must of broken [sic]. I think I have very bad anger issues and something needs to happen.

Ex. Vol. 1 p. 123.

[7] The State charged Hargis with three counts of Level 3 felony neglect of a dependent resulting in serious bodily injury—Count 1 for the broken femur, Count 2 for the broken ribs, and Count 3 for the broken tibia and fibula. All three counts alleged a date range of May 20, 2021, through June 5, 2021. The State also alleged that Hargis is a habitual offender based on prior felony convictions.

[8] A three-day jury trial was held in March 2025. On the first morning, Hargis was pulled over for speeding on his way to court. Hargis told the officer he was speeding because he was late for trial. Although Hargis's SUV wasn't properly registered, the officer told Hargis he would not tow the vehicle so that Hargis could make it to court. After being released, however, Hargis didn't go to court, nor did he contact his attorney or the court. The judge and the attorneys, clueless as to Hargis's whereabouts, had to decide how to proceed. Hargis's attorney told the court that she thought he would be there and moved for a continuance because the plan was for him to testify. The court denied the

motion, finding that Hargis had waived his right to be present. The court issued an arrest warrant and proceeded with trial. Hargis remained absent throughout.

[9] Dr. Shannon Thompson, a child-abuse pediatrician who examined J.H., testified at length about his injuries. Regarding the leg fractures, Dr. Thompson testified that the femur fracture was likely caused by a different force than the tibia and fibula fractures. Specifically, the femur fracture "requires a bending force or a direct impact to that leg," Tr. Vol. 3 p. 178, while the tibia and fibula fractures were likely caused by a "pretty significant yank or pull," *id.* at 171. However, Dr. Thompson could not say whether the fractures happened "at the same time or different times[.]" *Id.*

[10] The jury found Hargis not guilty on Count 2 (broken ribs) but guilty on Count 1 (broken femur) and Count 3 (broken tibia and fibula). It also found him to be a habitual offender. Hargis was arrested a few days later, and the court scheduled a sentencing hearing. At the hearing, Hargis offered the following explanation for his absence from trial:

> I did not intend to miss trial. I did get pulled over the morning of. I was wearing steel toes. I didn't know I wasn't allowed to wear steel toes in the Courthouse so I was going to get my shoes. I was doing seventy on a forty-five just so I didn't be late but obviously I was late. After I was released from custody of the police, it was 9:06 a.m. I was told a Warrant would already have been issued and my Court date would have been continued and when I called the jail they said there wasn't no Warrant and I couldn't turn myself in until a Warrant was issued so I was waiting on that.

Tr. Vol. 4 p. 9. Hargis didn't say who told him "a Warrant would already have been issued and [his] Court date would have been continued[.]"

[11] In sentencing Hargis, the trial court found seven aggravating circumstances: (1) Hargis's criminal and juvenile history (five felony convictions, six misdemeanor convictions, and ten juvenile adjudications); (2) prior attempts at rehabilitation have failed; (3) the nature and circumstances of the offenses; (4) Hargis violated a position of trust or care; (5) the impact on the victim; (6) the young age of the victim; and (7) Hargis's IRAS score indicates a high risk of reoffending. Finding no mitigating circumstances, the court imposed the maximum sentence of 16 years on each of the two neglect convictions and the maximum habitual-offender enhancement of 20 years, all consecutive, for a total of 52 years in the Department of Correction.

[12] Hargis now appeals.

## Discussion and Decision

### I. The trial court didn't abuse its discretion by finding that Hargis knowingly and voluntarily waived his right to be present at trial

[13] Hargis first contends that the trial court erred by finding that he knowingly and voluntarily waived his right to be present at trial. We review such a finding for an abuse of discretion. *Calvert v. State*, 14 N.E.3d 818, 821 (Ind. Ct. App. 2014). In explaining his absence from trial, Hargis didn't claim that he was unaware of the trial date or that he was unable to attend. Rather, he said some unidentified

person told him that, because he was late for court, an arrest warrant "would already have been issued" and trial "would have been continued." The trial court either (1) didn't believe this vague, self-serving claim or (2) concluded that, even if someone told Hargis there would be a continuance, Hargis acted unreasonably by not contacting his attorney or court staff to confirm that information. Either way, the court didn't abuse its discretion.

## II. Hargis's two neglect convictions constitute double jeopardy

[14] Hargis argues that his two neglect convictions constitute double jeopardy under the continuous-crime doctrine. *See, e.g., Hines v. State*, 30 N.E.3d 1216 (Ind. 2015). But as the State notes, this doctrine and all other common-law double-jeopardy rules were subsumed by the new tests announced by our Supreme Court in *Wadle v. State*, 151 N.E.3d 227 (Ind. 2020), and *Powell v. State*, 151 N.E.3d 256 (Ind. 2020). *See Jones v. State*, 159 N.E.3d 55, 61-62 (Ind. Ct. App. 2020). The *Wadle* test applies when a defendant is convicted of different statutory offenses with common elements, and the *Powell* test applies when, as here, a defendant is convicted of a single statutory offense multiple times. *Moyers v. State*, No. 26S-CR-86, 2026 WL 786823 *1 (Ind. Mar. 20, 2026). Hargis doesn't make an argument under *Powell*. The State contends that he therefore waived any such argument and that, in any event, there is no double jeopardy under *Powell*. Because the State has briefed the substance of *Powell*, and because we could have raised the issue sua sponte, *see Banks v. State*, 231

N.E.3d 853, 867 (Ind. Ct. App. 2024), *trans. denied*, we will analyze Hargis's convictions under *Powell*.

[15] The *Powell* test potentially includes two steps. Under the first step, we determine whether the statute at issue clearly indicates a "unit of prosecution." *Powell*, 151 N.E.2d at 264. "[A] unit of prosecution is 'the minimum amount of activity a defendant must undertake, what he must do, to commit each new and independent violation of a criminal statute[.]'" *Barrozo v. State*, 156 N.E.3d 718, 725 (Ind. Ct. App. 2020) (quoting *United States v. Rentz*, 777 F.3d 1105, 1109 (10th Cir. 2015) (en banc)). If the statute clearly indicates a unit of prosecution—that is, if the statute clearly allows multiple convictions for a single criminal act or transaction, or if it clearly allows only one conviction for a single criminal act or transaction—the court follows the legislature's guidance and the analysis is complete. *Powell*, 151 N.E.3d at 264. But if the statute is ambiguous as to the unit of prosecution, the court proceeds to the second step. *Id.* "Under this second step, a court must determine whether the facts—as presented in the charging instrument and as adduced at trial—indicate a single offense or whether they indicate distinguishable offenses." *Id.*

> To answer this question, we ask whether the defendant's actions are so compressed in terms of time, place, singleness of purpose, and continuity of action as to constitute a single transaction. If the defendant's criminal acts are sufficiently distinct, then multiple convictions may stand; but if those acts are continuous and indistinguishable, a court may impose only a single conviction. Any doubt counsels against turning a single transaction into multiple offenses.

*Id.* at 264-65 (quotation altered).

[16] Our Supreme Court's recent application of the *Powell* test in *Moyers* is helpful. Moyers was convicted of two counts of criminal confinement. That offense is generally a Level 6 felony, Ind. Code § 35-42-3-3(a), but one of the counts against Moyers was elevated to a Level 3 felony because he was armed with a deadly weapon, *see id.* at (b)(3), and the other count was elevated to a Level 4 felony because the confinement resulted in moderate bodily injury, *see id.* at (b)(2). In determining the unit of prosecution under that statute, the Court ignored the enhancing circumstances and focused on the base offense: "A person who knowingly or intentionally confines another person without the other person's consent commits criminal confinement." *Moyers*, 2026 WL 786823 at *7. The Court held that the unit of prosecution is "confining another person without their consent." *Id.* The Court noted that "a 'confinement ends when the victim both feels free and is, in fact, free from detention, and a separate confinement begins if and when detention of the victim is re-established.'" *Id.* (quoting *Penrod v. State*, 810 N.E.2d 345, 346 (Ind. 2004)). The question, then, was whether the evidence showed that the defendant committed "one or two discrete acts of criminal confinement." *Id.* The evidence showed that while the victim attempted to escape his confinement at one point, he was unsuccessful, so he "was never actually free and certainly never felt free[.]" *Id.* at *8. Therefore, a single continuous act of confinement occurred, and there could be only one confinement conviction. *Id.*

[17]     We reach a similar conclusion here. The State charged Hargis with multiple counts of neglect of a dependent resulting in serious bodily injury under Indiana Code section 35-46-1-4(a)(1) and (b)(2). Subsection (a)(1) defines the base offense: "A person having the care of a dependent, whether assumed voluntarily or because of a legal obligation, who knowingly or intentionally . . . places the dependent in a situation that endangers the dependent's life or health . . . commits neglect of a dependent, a Level 6 felony." Subsection (b)(2) makes the offense a Level 3 felony if it results in serious bodily injury. As *Moyers* instructs, in determining the unit of prosecution, we ignore the enhancing circumstance and focus on the base offense. The unit of prosecution under Section 35-46-1-4(a)(1) is placing a dependent in a situation that endangers the dependent's life or health. There is strong evidence that Hargis did so on the night of June 2, 2021, because the next day, Hargis told Savino that "something happened" with J.H. overnight, and Savino felt a click in J.H.'s leg, thought he was in pain, and noticed swelling. The question is whether there is evidence that Hargis placed J.H. in a dangerous situation on **another** occasion, establishing a second unit of prosecution. There is not.

[18]     To be sure, the evidence shows that J.H. suffered two different leg injuries that required two different types of force. Specifically, Dr. Thompson testified that the femur fracture required "a bending force or a direct impact to that leg" while the tibia and fibula fractures were likely caused by a "pretty significant yank or pull." However, when asked whether the fractures happened "at the same time or different times," Dr. Thompson couldn't say. She could say only

that both injuries were "less than five to seven days old." Because the evidence doesn't clearly establish that there was a second incident or episode of neglect in addition to what happened on the night of June 2, there cannot be a second neglect conviction. We therefore reverse the conviction and 16-year sentence on Count 3 and remand to the trial court with instructions to amend the Judgment of Conviction and Abstract of Judgment accordingly.[1]

## III. Hargis waived his argument that his sentence is inappropriate

[19] Hargis asks us to reduce his sentence under Indiana Appellate Rule 7(B), which provides that an appellate court "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Because we reverse the conviction and 16-year sentence on Count 3, Hargis's sentence will already decrease from 52 years to 36 years. To the extent he believes that even 36 years is inappropriate, he hasn't developed a meaningful argument. He asserts:

> The evidence presented during trial and at sentencing both show that Hargis is certainly not the worst of the worst offenders; nor can it be said the facts and circumstances of this case are the worst of the worst. Thus, the trial court had to find that Hargis and his acts are the worst of the worst. We do not believe this is

---

[1] Because we reverse one conviction and sentence on double-jeopardy grounds, we need not address Hargis's alternative argument that the trial court erred by imposing fully consecutive sentences on the two neglect convictions.

to be possible. Such a sentence is not appropriate in light of the foregoing. Thus, this Court should exercise its constitutional authority and revise Hargis's sentence.

Appellant's Br. p. 20. By failing to make a cogent argument supported by citations to the record and/or legal authority, Hargis waived his claim for 7(B) relief. *See* Ind. Appellate Rule 46(A)(8)(a); *Gentry v. State*, 835 N.E.2d 569, 577 (Ind. Ct. App. 2005) (holding that appellant waived 7(B) claim by failing to make a cogent argument).

## IV. The habitual-offender enhancement must be attached to the sentence for Count 1

[20] Though neither party raised this issue, we note that the trial court imposed the habitual-offender enhancement as a separate, consecutive sentence. That is contrary to the habitual-offender statute, which provides, in part:

> Habitual offender is a status that results in an enhanced sentence. It is not a separate crime and does not result in a consecutive sentence. The court shall attach the habitual offender enhancement to the felony conviction with the highest sentence imposed and specify which felony count is being enhanced.

I.C. § 35-50-2-8(j). Therefore, on remand, the trial court must attach the habitual-offender enhancement to the sentence for Count 1.

[21] Affirmed in part, reversed in part, and remanded.

Mathias, J., and Pyle, J., concur.

ATTORNEY FOR APPELLANT

Ryan M. Gardner
Deputy Public Defender
Fort Wayne, Indiana


ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General

George P. Sherman
Supervising Deputy Attorney General
Indianapolis, Indiana